Maurice L. FRUGE

v.

DAMSON DRILLING COMPANY et al.

Civ. A. No. 74–1048.

United States District Court,
W. D. Louisiana,
Lafayette Division.

Dec. 6, 1976.

Larry T. Richard, Cline, Miller, Richard & Miller, Rayne, La., for plaintiff and defendant Trahan Brothers, Inc., on cross-claim filed by Thomas Aucoin Boat Rentals, Inc.

John A. Jeansonne, Jr., Lafayette, La., for defendants Damson Drilling Co., Hartford Accident & Indemnity Co.

W. Gerald Gaudet, Voorhies & Labbe, Lafayette, La., for defendant Trahan Brothers, Inc.

Gerard T. Gelpi and Norman C. Sullivan, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant Thomas Aucoin Boat Rentals, Inc.

## REASONS FOR JUDGMENT

DAVIS, District Judge.

This suit claims damages resulting from injuries received in three separate accidents. Plaintiff, in the first count of the petition, seeks damages from Damson Drilling Company (Damson) for a hernia sustained, either on March 20 or May 15, 1973. The second count of the petition claims damages against Damson for neck injuries sustained during August, 1973. The third count of the petition claims damages for injuries sustained by plaintiff on April 29, 1974, in a crewboat collision between the C/B BRIGHT STAR, owned by Thomas Aucoin Boat Rentals, Inc., (Aucoin) and the C/B SHARON K, owned by Trahan Brothers, Inc., (Trahan). Plaintiff was a passenger in the BRIGHT STAR.

Prior to trial, plaintiff compromised with Damson and Trahan. In the settlement instrument with Damson, plaintiff released Damson in connection with the first two injuries. Trahan was fully released by plaintiff for all liability Trahan had in connection with the crewboat collision.

The matter proceeded to trial only against Aucoin and, at the conclusion of the trial, the Court rendered oral reasons for judgment, finding the BRIGHT STAR seventy-five per cent at fault in the collision and the SHARON K twenty-five per cent at fault. The Court found no negligence on the part of plaintiff.

The questions presented for decision, therefore, are: 1) damages sustained by plaintiff, and 2) the effect of the settlements made by plaintiff upon the amount of his recovery.

## I. DAMAGES

Plaintiff received neck injuries in both the accident of August, 1973, and the crewboat collision of April 29, 1974. Although the plaintiff has compromised his claim for the injuries he sustained in the August, 1973, accident, the medical evidence relating to neck injuries sustained in both accidents must be considered.

Following plaintiff's accident in August of 1973, he first saw Dr. Lester A. Ancelet, a general surgeon, on August 27, 1973. Although plaintiff was complaining of pain in the neck area, Dr. Ancelet found little in the way of objective clinical signs. Dr. Ancelet interpreted x-rays as normal except for some narrowing in the C–5/C–6 area of the spine. (Dr. Ancelet's deposition, P. 7)

Dr. Ancelet next saw plaintiff on February 24, 1974. Mr. Fruge was still complaining of pain in the neck area. Dr. Ancelet discharged plaintiff at that time with the office notation that this condition was permanent and would continue to aggravate the patient while working with his neck hyperflexed.

The testimony reflects that plaintiff missed no work as a result of the August, 1973, incident.

Plaintiff was next seen by Dr. Ancelet on April 29, 1974, the date of the crewboat collision. Upon examination on this occasion, Dr. Ancelet found a minor puncture wound of the leg and elicited a history of pain in the right shoulder and right arm. Because of plaintiff's complaints of numbness and weakness radiating into the right arm, Dr. Ancelet referred plaintiff to an orthopedic surgeon, Dr. David Drez. Dr. Drez saw plaintiff on July 17, 1974, and also elicited a history of right arm numbness and weakness. Dr. Drez suspected a nerve root problem and had an EMG conducted. This diagnostic test was positive and indicated nerve root involvement on the right side. (Dr. Drez' deposition, P. 6). The positive EMG and the clinical examination caused Dr. Drez to refer plaintiff to Dr. Mark Kubala, a neurosurgeon. Dr. Kubala performed a myelogram on August 10, 1974, which he interpreted as being positive for ruptured disc or other nerve root involvement in the C–5/C–6 area of the spine.

Both Drs. Drez and Kubala recommended that plaintiff undergo surgery to alleviate the nerve root compression. Plaintiff was unwilling to submit to the surgery.

Defendants offered the testimony of Dr. Norman P. Morin, orthopedic surgeon of

Lake Charles. Dr. Morin examined plaintiff on November 5, 1973, and September 26, 1975.

A fair summary of Dr. Morin's testimony is that: 1) plaintiff was grossly exaggerating his complaints, particularly with regard to the numbness and radiating pain which he claimed existed in his right arm; 2) the symptoms which were justified were attributable to a mild to moderately advanced arthritis which pre-existed the crewboat collision.

The Court is unable to accept the testimony of Dr. Morin, which is in conflict with the balance of the medical evidence. Additionally, the fact that plaintiff voluntarily submitted to a myelogram flies in the face of Dr. Morin's opinion that Mr. Fruge was "faking."

All of the physicians seem to agree that plaintiff is probably unable to resume his regular employment as a welder.

■ The Court finds from a preponderance of the evidence that plaintiff's nerve root compression, whether caused by a ruptured disc or aggravation of pre-existing arthritic condition, was proximately caused by the injuries he sustained in the crewboat collision. This finding is based on the testimony of Dr. Ancelet, the primary treating physician, and the testimony of Drs. Drez and Kubala. The onset of pain and numbness in the right arm following the crewboat accident is particularly persuasive. Also, the fact that plaintiff continued to work regularly prior to the crewboat collision is significant.

Defendant argues that the plaintiff has failed to mitigate his damages by refusing to submit to a laminectomy, which was recommended by both Dr. Drez and Dr. Kubala.

■ The plaintiff was 59 years of age at the time of the accident and 61 at the time of the trial. Plaintiff apparently is not in severe pain and is able to perform light sedentary-type duties. Under these circumstances, plaintiff's decision to decline the surgery is not unreasonable and he should not be penalized on that account. See *Haughton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir. 1972).

Plaintiff's total damages suffered as a result of the crewboat collision are assessed as follows:

a) Medical expenses (bill of Dr. Alfred E. Harmon for services rendered on December 5, 1975) $ 226.00 [1]

b) Lost earnings between the date of the accident and the date of trial (two years and six months at $10,102.00 per year) _____$25,225.00 [2]

c) Future lost wages [until age 65] (four years at $7,000.00 per year discounted at 6%) _____$24,255.70 [3]

d) Past and future pain and suffering _____$15,000.00

TOTAL _____$64,736.70

## II. EFFECT OF PLAINTIFF'S SETTLEMENTS UPON HIS RECOVERY AGAINST AUCOIN

■ In the compromise agreement entered into between plaintiff and plaintiff's employer, Damson Drilling Company, plaintiff released Damson only for Damson's liability in connection with the hernia injury and the 1973 neck injury. That compromise cannot reduce the damages recoverable by plaintiff for injuries sustained in the crewboat accident which occurred in April, 1974.

A more serious question is presented as to the effect of plaintiff's settlement with

1. This is the only medical bill in evidence. The balance of the medical expenses were apparently paid by plaintiff's employer.

2. In arriving at lost wages to the date of trial, we used as a wage base the gross wages of plaintiff for 1973, $10,102.00.

3. The physicians who testified agreed that plaintiff, while he was unable to weld, was capable of performing lighter sedentary-type work. We conclude that it is reasonable that plaintiff can earn $3,100.00 per year in this sedentary-type employment. In assessing future lost wages, we used as an annual wage base the sum of $7,000.00.

Trahan, whose negligence contributed to the crewboat collision to the extent of 25%.

Under the law of the Fifth Circuit, as it presently exists, plaintiff's compromise with Trahan would cause his recoverable damages to be reduced by the amount he received in settlement from the co-tortfeasor, Trahan. Thus, under this rule, to arrive at damage figure recoverable from Aucoin, plaintiff's total damages would be reduced by the $15,000.00 settlement sum he received from Trahan. *See Billiot v. Sewart Seacraft, Inc.*, 382 F.2d 662 (5th Cir. 1967), and *Loffland Brothers Company v. Huckabee*, 373 F.2d 528 (5th Cir. 1967). These cases, however, were decided before *Cooper Stevedoring Company, Inc. v. Fritz Kopke, Inc.*, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), [which recognized the rule of contribution between joint tortfeasors in maritime cases] and *Reliable Transfer Company, Inc. v. United States*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), [which requires an assessment of damages based upon proportionate fault in maritime collision cases].

Under the facts of this case, if the Court simply reduces plaintiff's total damages of $64,736.70 by the $15,000.00 paid to plaintiff by Trahan, the balance recoverable against Aucoin would amount to $49,736.70. This result would require the defendant Aucoin to pay more than 75% of the total damages sustained by the plaintiff in the crewboat collision. This result is contrary to the rationale of *Reliable*, which limits plaintiff's recovery against Aucoin under the facts of this case to 75% of his total damages. Inasmuch as this is a maritime collision case, the Court elects to follow *Leger v. Drilling Well Control, Inc.*, 69 F.R.D. 358 (W.D.La.1976), decided by Judge Hunter of this Court. Applying the *Leger* reasoning to this case, Aucoin will be responsible for 75% of the total damages sustained by plaintiff in the crewboat collision, or $48,552.53.

I am not convinced, however, that the rule laid down in *Leger* should be applied as a matter of general application in non-collision maritime cases. Many, if not most, of the maritime personal injury cases tried in this Court involve multiple defendants. In a typical case involving, for example, equipment failure, it is common to have allegations of operational negligence against several defendants and allegations against the equipment manufacturer and seller relating to a failure to furnish a safe, defect-free product. In the event of a settlement with less than all defendants in such case, *Leger* would require a detailed, complex determination by the jury as to the percentage of fault of plaintiff, each settling defendant and each remaining defendant. The trial would be extended to permit the remaining defendants an opportunity to establish a case of liability against the settling defendants.

As a matter of general application, therefore, I question whether the *Leger* result is sufficiently desirable to compensate for the added complexities and expenditure of judicial time necessary to achieve it.

In this collision case, however, I agree that the rule enunciated by Judge Hunter in *Leger* should be applied.

The applicability of the *Reliable* apportionment of damages rule in maritime non-collision cases and the effect of settlements with less than all defendants are frequent, recurring questions which will, hopefully, be presented and decided by the Fifth Circuit soon.

A judgment in favor of plaintiff and against defendant Aucoin in the amount of $48,552.53 will be signed upon presentation.